## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | CASE NO.: |
| | ) | |
| v. | ) | JUDGE: |
| | ) | |
| CENGAGE LEARNING HOLDINGS I, L.P., | ) | |
| CENGAGE LEARNING HOLDINGS II L.P., | ) | Case: 1:08-cv-00899 |
| CENGAGE LEARNING, INC., | ) | Assigned To : Bates, John D. |
| APAX/TL HOLDINGS, LLC, | ) | Assign. Date : 5/28/2008 |
| EDUCATION MEDIA AND PUBLISHING | ) | Description: Antitrust |
| GROUP LIMITED, and | ) | |
| HOUGHTON MIFFLIN HARCOURT | ) | |
| PUBLISHING COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPETITIVE IMPACT STATEMENT

Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the

Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files

this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in

this civil antitrust proceeding.

## I.    NATURE AND PURPOSE OF THE PROCEEDING

The United States filed a civil antitrust Complaint on May 28, 2008, seeking to enjoin the

proposed acquisition by Cengage Learning, Inc., and related entities (collectively "Cengage"), of

the assets of the Houghton Mifflin College Division ("HM College") from Houghton Mifflin

Harcourt Publishing Company, and a related entity (collectively "Houghton Mifflin").  The

Complaint alleges that the likely effects of this acquisition would be to substantially lessen

competition in the development, publication, and sale of textbooks and ancillary educational

materials (collectively "textbooks and ancillary materials") used in fourteen higher education courses listed in Appendix A (hereinafter "the Overlap Courses"), in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. The loss of competition caused by the acquisition would likely result in a reduced rate of quality improvements in, and/or increased prices for, the textbooks and ancillary materials used in each of the fourteen courses in the United States.

At the same time the Complaint was filed, the United States also filed an Asset Preservation Stipulation and Order ("APSO") and a proposed Final Judgment, which are designed to eliminate the anticompetitive effects of the acquisition. Under the proposed Final Judgment, which is explained more fully below, the Defendants are required to divest all tangible and intangible assets used in the development, production, servicing, marketing, distribution and sale of certain textbooks in the Overlap Courses and all associated ancillary educational materials (collectively "Divestiture Assets"). Until the divestitures required by the Final Judgment have been accomplished, the APSO requires the Defendants to preserve and maintain the value of and goodwill in the Divestiture Assets, and continue to operate the Divestiture Assets as economically viable, competitive, and ongoing business properties.

The United States and Defendants have stipulated that the proposed Final Judgment may be entered after compliance with the APPA. Entry of the proposed Final Judgment would terminate this action, except that the Court would retain jurisdiction to construe, modify, or enforce the provisions of the proposed Final Judgment and to punish violations thereof.

## II.    DESCRIPTION OF THE EVENTS GIVING RISE TO THE ALLEGED VIOLATIONS

### A.    The Defendants and the Proposed Transaction

Cengage Learning, Inc. is a Delaware corporation with its headquarters in Stamford, Connecticut.  Cengage Learning Holdings I, L.P., a limited partnership with its headquarters in Stamford, Connecticut, is the ultimate parent entity of Cengage Learning, Inc.  Cengage Learning Holdings II L.P., a limited partnership with its headquarters in Stamford Connecticut, is an intermediate entity between Cengage Learning Holdings I, L.P. and Cengage Learning, Inc. Apax/TL Holdings, LLC, a Delaware limited liability company, is the general partner in Cengage Learning Holdings I, L.P.  The above entities (collectively "Cengage") develop, publish and sell textbooks and ancillary materials for use in the United States and elsewhere.  Cengage is the second largest publisher of textbooks and ancillary materials used in courses taught at higher education institutions in the United States and ranks among the top three sellers of such textbooks and materials for each of the Overlap Courses.   Cengage had total revenues of about $1.7 billion in the twelve-month period ending September 30, 2007, including about $1 billion in revenues from the sale of higher education textbooks and ancillary materials.

Houghton Mifflin Harcourt Publishing Company (formerly Houghton Mifflin Company) is a Massachusetts corporation with its headquarters in Boston, Massachusetts.  Education Media and Publishing Group Limited, a Cayman Islands corporation with its headquarters in Dublin, Ireland, is the ultimate parent entity of Houghton Mifflin Harcourt Publishing Company.  The above entities (collectively "Houghton Mifflin"), develop, publish and sell textbooks and ancillary materials for use in the United States and elsewhere.  Houghton Mifflin's HM College Division is the fifth largest publisher of textbooks and ancillary materials used in courses taught

3

at higher education institutions in the United States and ranks among the top three sellers of such textbooks and materials for each of the Overlap Courses. Houghton Mifflin has total annual revenues of about $2.5 billion, and estimated 2007 revenues of about $230 million from the sale of textbooks and ancillary materials by HM College.

On or about November 30, 2007, Cengage and Houghton Mifflin entered into an agreement for Cengage to acquire the assets of HM College for approximately $750 million.

**B.     The Competitive Effects of the Transaction**

      1.     Textbooks and Ancillary Materials

Publishers market and sell textbooks and ancillary materials for use in courses taught at higher education institutions. In most cases, instructors select the textbooks and ancillary materials that will be used for their courses, and students buy the selected textbooks and ancillary materials.

Textbooks are often supplemented with ancillary educational materials, such as teacher's editions, audio-visual teaching tools, Internet content, CD-ROMs, workbooks, and study guides. These ancillary materials are often offered by publishers for free or as part of a discounted package to induce instructors to select a particular textbook and to induce students to purchase the publisher's textbooks and ancillary materials. Textbooks and ancillary materials are used as the primary teaching materials in each of the Overlap Courses.

      2.     Relevant Product Markets

The Complaint alleges that for each Overlap Course, the textbooks and ancillary materials for that course constitute a separate relevant product market and a line of commerce pursuant to Section 7 of the Clayton Act.

Textbooks and ancillary materials are used as the primary teaching materials in each of

the Overlap courses. Textbooks provide the core written material for the Overlap Courses and serve as the foundation for instructors' overall lesson plans. While instructors could use alternative teaching materials (such as copies of lecture notes and articles), they generally select textbooks to serve as the primary teaching materials for their courses because accessing and creating alternative teaching materials is often a more time-consuming, costly, and inefficient method of delivering high quality content to their students. Instructors using textbooks and ancillary materials would not turn to any alternative teaching materials in sufficient numbers to defeat a small but significant increase in the price of any textbooks and ancillary materials for the Overlap Courses, or a small but significant decrease in the quality of such textbooks and other materials.

Students taking the Overlap Courses are unlikely to have any significant alternatives to purchasing new textbooks for their Overlap Courses. Although used textbooks, if available, can sometimes serve as alternatives for new textbooks, used textbooks are not uniformly available in large numbers. Moreover, instructors often require students to use the newest textbook editions. Publishers generally revise textbooks every three to four years, and revised textbooks often differ substantially from their prior edition, limiting the extent to which used textbooks may be substituted for new editions of the same textbooks. Students would not turn to purchasing used textbooks in sufficient numbers to defeat a small but significant increase in the price of a new edition of the textbooks.

3.    Relevant Geographic Market

The Complaint alleges that Defendants market and sell textbooks and ancillary materials for use in courses taught at higher education institutions throughout the United States. Market participants for each relevant product market alleged in the Complaint are those publishers from

5

which instructors select textbooks and ancillary materials for use as primary teaching materials in their courses. A hypothetical monopolist of the textbooks and ancillary materials sold for use in any Overlap Course in the United States could profitably lower the rate of quality improvements in, or increase the price of, such textbooks and ancillary materials in the United States. Therefore, for each relevant product market alleged in the Complaint, the United States constitutes a relevant geographic market pursuant to Section 7 of the Clayton Act.

4.    Anticompetitive Effects of the Acquisition

In each relevant product and geographic market alleged in the Complaint, Cengage and HM College offer leading textbooks and ancillary materials that are close substitutes for a significant number of customers in that market. In each such market, Cengage and HM College are among the few firms with a significant presence that compete to provide textbooks and ancillary materials, and together they account for at least 35 percent of all sales. Using a standard concentration measure called the Herfindahl-Hirschman Index ("HHI"), the proposed acquisition would substantially raise market concentration in highly concentrated markets, increasing the HHI by more than 500 and producing a post-merger HHI in excess of 3000 in each relevant market.

Cengage and HM College compete head-to-head to have their textbooks and ancillary materials selected by instructors for each Overlap Course in the United States. This competition has provided significant incentives for each to publish new titles and improve product quality, and it has also disciplined pricing decisions. Although textbooks are purchased by students who do not select the books, the Department's investigation revealed that when institutions and instructors request price concessions at the time they are selecting textbooks, publishers such as Cengage and HM College have competed to provide them. The proposed acquisition would

eliminate the competition between Cengage and HM College in each relevant market, increasing the likelihood that Cengage will unilaterally increase prices or reduce its investment or other efforts to develop new or improved textbooks and ancillary materials.

The proposed acquisition therefore is likely to substantially lessen competition in the development, publication, and sale of textbooks and ancillary materials in each of the relevant markets alleged in the Complaint, in violation of Section 7 of the Clayton Act.

5.    Entry Would Not Likely Constrain the Acquisition's Adverse Effects

The Complaint alleges that, in each of the relevant product and geographic markets, there is unlikely to be timely entry by any firm that would be sufficient to defeat the likely anticompetitive effects of the proposed acquisition. Successful entry into developing, publishing, and selling textbooks and ancillary materials in each of the relevant markets is difficult, time-consuming, and costly.

Successful entry generally can be achieved only over many years and after at least one or more textbook revision cycles. Significant investment and effort are required to assemble authors, editorial staff and reviewing professors, to develop and obtain licenses to copyrighted content and ancillary educational materials, and to train a knowledgeable sales force. The outcome of any such effort would be highly uncertain, because, among other things, the reputation of a successful incumbent textbook is difficult for a publisher of a new textbook to challenge. The leading textbooks in each relevant market have been published for some time and are well-known to instructors. Most instructors switch textbooks infrequently because they develop course syllabi, lesson plans, homework, tests, and other materials that conform to the textbooks they use, and changing textbooks often requires modifications to course syllabi and other materials.

7

## III.    EXPLANATION OF THE PROPOSED FINAL JUDGMENT

### A.    The Required Divestitures

Section IV.A of the proposed Final Judgment requires that the Defendants divest the existing or future textbooks described in Appendix A, which are used in the Overlap Courses, and associated ancillary educational materials used with those textbooks.  The Divestiture Assets may be sold to more than one acquirer with approval of the United States.  Section II.C specifies that the divested textbooks include all supplements to, derivations of, and customized versions of the textbooks, except the Defendants are not required to divest existing publications that were customized for specific institutions that contain only a small amount of content (less than 25%) written by an author listed on Appendix A.  The description of Divestiture Assets in Section II.C will ensure that the acquirer or acquirers shall have access to all ancillary educational materials offered with a divested textbook.  The Defendants are required to divest all associated ancillary materials offered specifically or primarily for use with the textbooks.  With respect to other ancillary educational materials that are offered primarily for use with Defendants' other textbooks, but are also offered with divested textbooks, the Defendants are required to grant the acquirer(s) a one-year license to use any such materials.  To the extent an acquirer desires to continue to provide these other ancillary materials to instructors and students who use a divested textbook, the one-year license is intended to provide the acquirer a sufficient period of time to continue selling the Defendants' materials while it develops substitute materials.

The Divestiture Assets also include all tangible and intangible assets related to the divested textbooks and any ancillary educational materials associated with those textbooks.  For example, Section II.C(1)(a) provides that the Divestiture Assets include, among other things, all original artwork, illustrations and other content, and all contracts, author permissioning

agreements and other agreements related to the divested textbooks and ancillary materials. In addition, Section II.C(1)(b) provides that the Divestiture Assets include, among other things, licenses and sublicenses to intellectual property of any kind that is used in the development, production, servicing, marketing, distribution, and sale of any of the divested textbooks or ancillary materials.

The Divestiture Assets do not include Defendants' company names or trademarks, except that the Divestiture Assets include nonexclusive licenses to use the corporate trademarks or trade names of Cengage or Houghton Mifflin sufficient to allow the acquirer(s) to sell finished inventory or other materials that have already been marked with such trademarks or trade names. This provision will ensure that the acquirer(s) will not infringe the Defendants' intellectual property rights in the course of distributing the finished inventory.

Sale of the Divestiture Assets according to the terms of the proposed Final Judgment will preserve competition between the textbooks and ancillary materials to be divested and the textbooks and ancillary materials that Cengage will retain and will thus eliminate the anticompetitive effects of the proposed acquisition in each relevant market alleged in the Complaint. In each of the Overlap Courses, the textbooks to be divested, alone or in combination with each other, are among the leading textbooks sold by Defendants. For several of the Overlap Courses, the Final Judgment requires the divestiture of all of the significant textbooks Cengage or HM College offers for sale. For others, the textbooks to be divested are the publications by one Defendant that are close substitutes with textbooks offered by the other Defendant, and thus as to which there is meaningful competition between Cengage and HM College that would have been eliminated by the proposed acquisition.

**B.**    **Selected Provisions of the Proposed Final Judgment**

In antitrust cases involving acquisitions in which the United States seeks a divestiture remedy, the United States seeks to require completion of the divestiture(s) within the shortest period of time reasonable under the circumstances. A quick divestiture has the benefits of restoring competition lost in the acquisition and reducing the possibility that the value of the assets will be diminished. Section IV.A of the proposed Final Judgment requires the Defendants to divest the Divestiture Assets within forty-five (45) calendar days after the filing of the Complaint in this matter, or five (5) calendar days after notice of the entry of this Final Judgment by the Court, whichever is later.[1] Section IV.H requires that the Divestiture Assets be divested in such a way as to satisfy the United States in its sole discretion that the Divestiture Assets will remain viable and can and will be operated by the acquirer(s) as part of a viable, competitively-effective, ongoing higher education textbook publishing business and that the divestiture of such assets will remedy the competitive harm alleged in the Complaint.

Sections IV.B, IV.C, IV.D, and IV.E include specific obligations and prohibitions that require the Defendants to cooperate with prospective acquirer(s) and facilitate the divestitures. Similarly, Section IV.F requires the Defendants to use their best efforts to facilitate the assignment to the acquirer(s) of all assets included in the Divestiture Assets that Defendants hold or use pursuant to a license or any other agreement.

Section V.G creates a limited exception to the Defendants' obligation to divest the Divestiture Assets in their entirety by allowing Cengage to retain a nonexclusive license to

---

[1] The proposed Final Judgment also provides that this time period may be extended by the United States in its sole discretion for a period not to exceed thirty (30) calendar days, and that the Court will receive notice of any such extension.

certain intellectual property that is used jointly in divested textbooks and textbooks that are not being divested. Cengage has the right to obtain a one-year license to continue to include content written by an author on Appendix A in certain customized publications that are not required to be divested and to continue to sell for use with textbooks that will not be divested ancillary educational materials that are primarily, but not exclusively, used with the divested textbooks. This license is intended to allow Cengage a sufficient period of time to continue its limited use of the divested content while it develops substitute content. Cengage also has the right to a license to continue using any copyrighted art, charts or similar content that has been included in both divested textbooks and textbooks that will not be divested, other than content attributable to the authors of the divested textbooks. Cengage may continue to use this content in all existing and future textbooks and ancillary materials, except that Cengage must obtain the consent of the acquirer(s) to use the content in future textbooks or ancillary materials that will compete with the divested textbooks and ancillary materials.

Section V.A of the proposed Final Judgment provides that in the event the Defendants do not accomplish the divestitures within the periods prescribed in Section IV.A of the proposed Final Judgment, the Court will appoint a trustee selected by the United States to effect the divestitures. Section IV.H requires that any sale of the Divestiture Assets by a trustee be acceptable to the United States, in its sole discretion, and specifies that any divestiture by a trustee must satisfy the same criteria that a divestiture by Defendants must satisfy. Section V.B provides that, after a trustee is appointed, only the trustee will have the right to sell the Divestiture Assets, and Section V.C precludes Defendants from objecting to a sale by the trustee on any ground other than the trustee's malfeasance. Section V.E requires Defendants to use their best efforts to assist the trustee in accomplishing the divestitures.

11

If a trustee is appointed, Section V.D provides that Defendants will pay all costs and expenses of the trustee. The trustee's commission will be structured so as to provide an incentive for the trustee based on the price obtained and the speed with which the divestitures are accomplished. After his or her appointment, Section V.F requires the trustee to file monthly reports with the Court and the United States setting forth his or her efforts to accomplish the required divestitures. Section V.G requires that, if the required divestitures have not been accomplished within six (6) months after a trustee's appointment, the trustee and the United States will both make recommendations to the Court, which shall enter such orders as appropriate to carry out the purpose of the Final Judgment, which may include extending the trust or the term of the trustee's appointment.

### C.    The Asset Preservation Stipulation and Order

To ensure that the Divestiture Assets will be preserved, maintained, marketed, and further developed, and continue to be operated as economically viable and ongoing business properties, until the divestitures required by the proposed Final Judgement have been accomplished, the United States and Defendants have agreed that the Court may enter the APSO that was filed simultaneously with the proposed Final Judgment.

Sections V.A and V.B of the APSO provide that Defendants are required to preserve and maintain the value and goodwill of the Divestiture Assets. Prior to the completion of the divestitures, Defendants must maintain and increase the sales and revenues of the Divestiture Asset-related products and services, and maintain all operational, promotional, developmental, advertising, sales, technical, customer-service and marketing funding and other support for the Divestiture Assets. Defendants must also ensure that the Divestiture Assets are fully maintained in operable and saleable condition and continue to be developed and updated, and maintain and

12

adhere to normal sales, development, updating, and support schedules for the Divestiture Assets. Section V.C requires the Defendants to provide sufficient capital to maintain the Divestiture Assets and to maintain the Divestiture Assets as economically viable, competitive, and ongoing business properties. Section V.D prevents the Defendants from transferring or otherwise disposing of the Divestiture Assets.

These asset preservation obligations should suffice to preserve competition during the brief 45 day-period between consummation of the acquisition and completion of the required divestitures. Defendants will be required to continue their ongoing efforts – which have in part been stimulated by competition between them – to make improvements to the textbooks to be divested, and to maintain or increase the sales of those books. Moreover, the period between consummation and divestiture is likely to occur during the summer months when instructors do not typically select textbooks for their courses, and thus when competitive sales efforts are less meaningful.

Section VI of the APSO requires the Defendants to appoint a person or persons to oversee the implementation of Defendants' obligations under the proposed Final Judgment and the APSO. The appointed person(s) will be responsible for ensuring Defendants' compliance with the asset preservation requirements specified in Section V of the APSO, will have complete managerial responsibility for the Divestiture Assets, and will have authority to direct and implement all steps necessary to ensure Defendants' full compliance with Section V. Any person(s) appointed to oversee the Divestiture Assets must receive a compensation package that provides a significant incentive to increase sales of the Divestiture Assets.

**IV.    REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS**

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. Entry of the proposed Final Judgment will neither impair nor assist the bringing of any private antitrust damage action. Under the provisions of Section 5(a) of the Clayton Act, 15 U.S.C. § 16(a), the proposed Final Judgment has no *prima facie* effect in any subsequent private lawsuit that may be brought against Defendants.

**V.    PROCEDURES AVAILABLE FOR MODIFICATION OF THE PROPOSED FINAL JUDGMENT**

The United States and Defendants have stipulated that the proposed Final Judgment may be entered by the Court after compliance with the provisions of the APPA, provided that the United States has not withdrawn its consent. The APPA conditions entry upon the Court's determination that the proposed Final Judgment is in the public interest.

The APPA provides a period of at least sixty (60) days preceding the effective date of the proposed Final Judgment within which any person may submit to the United States written comments regarding the proposed Final Judgment. Any person who wishes to comment should do so within sixty (60) days of the date of publication of this Competitive Impact Statement in the Federal Register, or the last date of publication in a newspaper of a summary of this Competitive Impact Statement, whichever is later. All comments received during this period will be considered by the United States Department of Justice, which remains free to withdraw its consent to the proposed Final Judgment at any time prior to the Court's entry of judgment. The comments and the response of the United States will be filed with the Court and published in the Federal Register.

Written comments should be submitted to:

> James J. Tierney
> Chief, Networks & Technology Enforcement Section
> Antitrust Division
> United States Department of Justice
> 600 E Street, NW, Suite 9500
> Washington, D.C. 20530

The proposed Final Judgment provides that the Court retains jurisdiction over this action, and the parties may apply to the Court for any order necessary or appropriate for the modification, interpretation, or enforcement of the Final Judgment.

## VI.    ALTERNATIVES TO THE PROPOSED FINAL JUDGMENT

The United States considered, as an alternative to the proposed Final Judgment, a full trial on the merits against Defendants. The United States could have continued the litigation and sought preliminary and permanent injunctions against the proposed acquisition. The United States is satisfied, however, that the divestiture of assets described in the proposed Final Judgment will preserve competition in the development, publication and sale of textbooks and ancillary materials in the relevant markets alleged in the Complaint. Thus, the proposed Final Judgment would achieve all or substantially all of the relief the United States would have obtained through litigation, but avoids the time, expense, and uncertainty of a full trial on the merits of the Complaint.

## VII.   STANDARD OF REVIEW UNDER THE APPA FOR THE PROPOSED FINAL JUDGMENT

The Clayton Act, as amended by the APPA, requires that proposed consent judgments in antitrust cases brought by the United States be subject to a sixty-day comment period, after which the Court shall determine whether entry of the proposed Final Judgment "is in the public interest." 15 U.S.C. § 16(e)(1). In making that determination, the court, in accordance with the

statute as amended in 2004, is required to consider:

> (A)    the competitive impact of such judgment, including termination of alleged violations, provisions for enforcement and modification, duration of relief sought, anticipated effects of alternative remedies actually considered, whether its terms are ambiguous, and any other competitive considerations bearing upon the adequacy of such judgment that the court deems necessary to a determination of whether the consent judgment is in the public interest; and

> (B)    the impact of entry of such judgment upon competition in the relevant market or markets, upon the public generally and individuals alleging specific injury from the violations set forth in the complaint including consideration of the public benefit, if any, to be derived from a determination of the issues at trial.

15 U.S.C. § 16(e)(1)(A) & (B).  In considering these statutory factors, the court's inquiry is necessarily a limited one as the government is entitled to "broad discretion to settle with the defendant within the reaches of the public interest." *United States v. Microsoft Corp.*, 56 F.3d 1448, 1461 (D.C. Cir. 1995); *see generally United States v. SBC Commc'ns, Inc.*, 489 F. Supp. 2d 1 (D.D.C. 2007) (assessing public interest standard under the Tunney Act).[2]

As the United States Court of Appeals for the District of Columbia Circuit has held, under the APPA, a court considers, among other things, the relationship between the remedy secured and the specific allegations set forth in the government's complaint, whether the decree is sufficiently clear, whether enforcement mechanisms are sufficient, and whether the decree may positively harm third parties. *See Microsoft*, 56 F.3d at 1458-62.  With respect to the adequacy of the relief secured by the decree, a court may not "engage in an unrestricted evaluation of what relief would best serve the public." *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988)

---

[2] The 2004 amendments substituted "shall" for "may" in directing relevant factors for a court to consider and amended the list of factors to focus on competitive considerations and to address potentially ambiguous judgment terms. *Compare* 15 U.S.C. § 16(e) (2004), *with* 15 U.S.C. § 16(e)(1) (2006); *see also SBC Commc'ns*, 489 F. Supp. 2d at 11 (concluding that the 2004 amendments "effected minimal changes" to Tunney Act review).

(citing *United States v. Bechtel Corp.*, 648 F.2d 660, 666 (9th Cir. 1981)); *see also Microsoft*, 56 F.3d at 1460-62; *United States v. Alcoa, Inc.*, 152 F. Supp. 2d 37, 40 (D.D.C. 2001). Courts have held that:

> [t]he balancing of competing social and political interests affected by a proposed antitrust consent decree must be left, in the first instance, to the discretion of the Attorney General. The court's role in protecting the public interest is one of insuring that the government has not breached its duty to the public in consenting to the decree. The court is required to determine not whether a particular decree is the one that will best serve society, but whether the settlement is *"within the reaches of the public interest."* More elaborate requirements might undermine the effectiveness of antitrust enforcement by consent decree.

*Bechtel*, 648 F.2d at 666 (emphasis added) (citations omitted).[3]  In determining whether a proposed settlement is in the public interest, a district court "must accord deference to the government's predictions about the efficacy of its remedies, and may not require that the remedies perfectly match the alleged violations." *SBC Commc'ns*, 489 F. Supp. 2d at 17; *see also Microsoft*, 56 F.3d at 1461 (noting the need for courts to be "deferential to the government's predictions as to the effect of the proposed remedies"); *United States v. Archer-Daniels-Midland Co.*, 272 F. Supp. 2d 1, 6 (D.D.C. 2003) (noting that the court should grant due respect to the United States' prediction as to the effect of proposed remedies, its perception of the market structure, and its views of the nature of the case).

Courts have greater flexibility in approving proposed consent decrees than in crafting their own decrees following a finding of liability in a litigated matter. "[A] proposed decree must

---

[3]  *Cf. BNS*, 858 F.2d at 464 (holding that the court's "ultimate authority under the [APPA] is limited to approving or disapproving the consent decree"); *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975) (noting that, in this way, the court is constrained to "look at the overall picture not hypercritically, nor with a microscope, but with an artist's reducing glass"). *See generally Microsoft*, 56 F.3d at 1461 (discussing whether "the remedies [obtained in the decree are] so inconsonant with the allegations charged as to fall outside of the 'reaches of the public interest'").

be approved even if it falls short of the remedy the court would impose on its own, as long as it falls within the range of acceptability or is 'within the reaches of public interest.'" *United States v. Am. Tel. & Tel. Co.*, 552 F. Supp. 131, 151 (D.D.C. 1982) (citations omitted) (quoting *United States v. Gillette Co.*, 406 F. Supp. 713, 716 (D. Mass. 1975)), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001 (1983); *see also United States v. Alcan Aluminum Ltd.*, 605 F. Supp. 619, 622 (W.D. Ky. 1985) (approving the consent decree even though the court would have imposed a greater remedy). To meet this standard, the United States "need only provide a factual basis for concluding that the settlements are reasonably adequate remedies for the alleged harms." *SBC Commc'ns*, 489 F. Supp. 2d at 17.

Moreover, the court's role under the APPA is limited to reviewing the remedy in relationship to the violations that the United States has alleged in its Complaint, and does not authorize the court to "construct [its] own hypothetical case and then evaluate the decree against that case." *Microsoft*, 56 F.3d at 1459. Because the "court's authority to review the decree depends entirely on the government's exercising its prosecutorial discretion by bringing a case in the first place," it follows that "the court is only authorized to review the decree itself," and not to "effectively redraft the complaint" to inquire into other matters that the United States did not pursue. *Id.* at 1459-60. As this Court recently confirmed in *SBC Communications*, courts "cannot look beyond the complaint in making the public interest determination unless the complaint is drafted so narrowly as to make a mockery of judicial power." *SBC Commc'ns*, 489 F. Supp. 2d at 15.

In its 2004 amendments, Congress made clear its intent to preserve the practical benefits of utilizing consent decrees in antitrust enforcement, adding the unambiguous instruction that "[n]othing in this section shall be construed to require the court to conduct an evidentiary hearing

18

or to require the court to permit anyone to intervene." 15 U.S.C. § 16(e)(2). The language wrote

into the statute what Congress intended when it enacted the Tunney Act in 1974, as Senator

Tunney explained: "[t]he court is nowhere compelled to go to trial or to engage in extended

proceedings which might have the effect of vitiating the benefits of prompt and less costly

settlement through the consent decree process." 119 Cong. Rec. 24,598 (1973) (statement of

Senator Tunney). Rather, the procedure for the public interest determination is left to the

discretion of the court, with the recognition that the court's "scope of review remains sharply

proscribed by precedent and the nature of Tunney Act proceedings." *SBC Commc'ns*, 489 F.

Supp. 2d at 11.[4]

---

[4] *See United States v. Enova Corp.*, 107 F. Supp. 2d 10, 17 (D.D.C. 2000) (noting that the "Tunney Act expressly allows the court to make its public interest determination on the basis of the competitive impact statement and response to comments alone"); *United States v. Mid-Am. Dairymen, Inc.*, 1977-1 Trade Cas. (CCH) ¶ 61,508, at 71,980 (W.D. Mo. 1977) ("Absent a showing of corrupt failure of the government to discharge its duty, the Court, in making its public interest finding, should . . . carefully consider the explanations of the government in the competitive impact statement and its responses to comments in order to determine whether those explanations are reasonable under the circumstances."); S. Rep. No. 93-298, 93d Cong., 1st Sess., at 6 (1973) ("Where the public interest can be meaningfully evaluated simply on the basis of briefs and oral arguments, that is the approach that should be utilized.").

## VIII.   DETERMINATIVE DOCUMENTS

There are no determinative materials or documents within the meaning of the APPA that were considered by the United States in formulating the proposed Final Judgment.

Dated: May 28, 2008

<div style="margin-left: 40%;">

Respectfully submitted,

Janet J. Brody
Justine K. Donahue (DC Bar #476255)
Aaron Comenetz (D.C. Bar #479572)
John C. Filippini (D.C. Bar #165159)
Kent Brown
Aaron Brodsky

Attorneys, Networks & Technology Enforcement Section
Antitrust Division, United States Department of Justice
600 E Street, NW, Suite 9500
Washington, D.C. 20530
(202) 307-6200

</div>

**Appendix A**

| Course | Textbooks |
|---|---|
| Business: Introductory | All textbooks that relate to the study of introduction to business with which Louis Boone has been or will be associated, and all textbooks that relate to the study of introduction to business with which David Kurtz has been or will be associated. |
| Foreign Languages and Literature: French: Language: Business French | All textbooks with which Jean-Luc Penfornis has been or will be associated. |
| Foreign Languages and Literature: French: Language: Intermediate | All textbooks that relate to the study of French language or literature at the intermediate level with which Michael Oates has been or will be associated, all textbooks with which Jacques Dubois has been or will be associated, all textbooks with which Simone Renaud has been or will be associated, all textbooks with which Dominique Van Hooff has been or will be associated, all textbooks that relate to the study of French language or literature at the intermediate level with which Jean-Paul Valette has been or will be associated, and all textbooks that relate to the study of French language or literature at the intermediate level with which Rebecca Valette has been or will be associated. |
| Foreign Languages and Literature: German: Language: Grammar | All textbooks with which Kimberly Sparks has been or will be associated, and all textbooks with which Van Horn Vail has been or will be associated. |
| Foreign Languages and Literature: Italian: Language: Elementary | All textbooks with which Marcel Danesi has been or will be associated, and all textbooks with which Suzanne Branciforte has been or will be associated. |
| Foreign Languages and Literature: Italian: Language: Intermediate | All textbooks with which Marcel Danesi has been or will be associated, and all textbooks with which Francesca Italiano has been or will be associated. |

| Course | Textbooks |
|---|---|
| History: Western Civilization Survey: 1500 to Present | All textbooks with which John McKay has been or will be associated. |
| History: Western Civilization Survey: 1750 to Present | All textbooks with which John McKay has been or will be associated. |
| History: Western Civilization Survey: Prehistory to 1715 | All textbooks with which John McKay has been or will be associated. |
| History: Western Civilization Survey: Prehistory to Present | All textbooks with which John McKay has been or will be associated. |
| History: World History Survey: 1400 to 1750 | All textbooks with which John McKay has been or will be associated. |
| History: World History Survey: 1500 to Present | All textbooks with which John McKay has been or will be associated. |
| History: World History Survey: Prehistory to Present | All textbooks with which John McKay has been or will be associated. |
| Interdisciplinary Studies: Orientation to College | All textbooks with which John Gardner has been or will be associated. |